266

PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* ANTONIO MEJÍAS VENTURA, *alias* EL CUBANO, Defendant and Appellant.

No. 5164.   Argued June 26, 1934.—Decided July 24, 1934.

*Samuel R. Quiñones* and *Pelayo Román Benítez* for appellant. *R. A. Gómez* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

On February 19, 1932, the district attorney of San Juan filed an information charging Antonio Mejías Ventura, *alias* El Cubano, with murder committed as follows: On February 3, 1932, and in San Juan, the said defendant, with malice aforethought and deliberate intent to kill, unlawfully killed Paul C. Herdering, a human being, assaulting and attacking him with a pistol, inflicting a bullet wound from which he died on February 5, 1932.

The defendant pleaded not guilty and on May 19, 1932, the trial of his case began before a jury and ended on the 21st with a verdict of guilty. The defendant moved for a new trial and his motion was denied on August 22, 1932. The court on August 27, 1932, sentenced him to life imprisonment. The latter appealed from the order denying a new trial and from the judgment of conviction. The points involved in both appeals are identical and there is a single record for both appeals.

The first witness produced by the district attorney was Dr. Arsenio Comas who is a resident surgeon in the Municipal Hospital of San Juan. He testified that on February 5, 1932, he performed a post mortem examination on the body of Paul C. Herdering which revealed a superficial wound piercing the right wrist and another in the hypogastric region with injury to the intestine, and that Herdering died from a serious case of peritonitis and septicemia caused by the bullet wound. He extracted the bullet which he found lodged inside the iliac bone and handed it to Mrs. Carreras, manageress of the hospital.

On cross-examination by counsel for the defendant he explained that the wounded man arrived at the hospital on the night of the 3rd. That same night he learned his name from the chart prepared by the nurse. Counsel for the

defendant moved to strike out the statement of the witness who said: "The attorney misunderstood me. I learned that he was Paul C. Herdering on the night of the operation. Then I went on attending him for two days, until he died." The defendant insisted and the court denied his motion.

The manageress of the hospital was the seventh witness for the prosecution. Her name is Josefa Moreno de Carreras. She stated that on reaching the hospital on the morning of February 4, she was handed a note from Dr. Comas together with $51 and the clothes of one Paul C. Herdering, all of which was to be kept in the safe of the hospital. At about a quarter past eight the doctor of the steamer "Nillus" came and asked her to take proper care of "Herdering," because they had to sail. She went up to the room and found the wounded man talking with the Captain. On being asked what was the matter with him he answered that he was dying.

The witness further testified that she interested herself greatly in the case and tried to have the wounded man tell her what had happened to him. The defendant objected. Several incidents arose and finally the hollowing happened:

"I insisted on his telling me . . . . and he then said: 'Alright,' and I took a notebook and wrote. He then said to me: 'I am going to tell you,' and began a narrative in this way: At seven (7) I left the boat. . . . .

"Defendant.—Just a moment. I regret to interrupt you. Your Honor, we raise the same question.

"Judge.—Let us hear the exact words uttered by the man prior to these.

"Dist. Attorney.—How was he feeling before he made that statement?

"Witness.—He was feeling pretty bad. He was saying: 'I am dying. I would like to take revenge on that man who has killed me . . . . . I hate Puerto Ricans . . . . .' He tought it was a Puerto Rican. 'I am dying, I am dying . . . . . I wish I had a bottle of whiskey to forget . . . . .' I then noticed that the man was seriously ill, took a pencil and paper and said to him: 'You have relatives, tell me,' and he then said that his mother was Annie Herdering and was living in Pedborn, Germany, and I noted it down.

If I am allowed I will make a full recital of what happened.

"Defendant.—How long afterwards did he die?

"Witness.—At five that very afternoon.

"Judge.—It seems to me that under the jurisprudence laid down in *People* v. *Díaz*, 35 P.R.R. 533, the grounds for the testimony of the witness have been sufficiently established and the court allows her to testify regarding the declarations of the dead man.

"Defendant.—We take exception.

"Dist. Attorney.—Yow may continue, madam.

"Witness.—I then said to him: 'Dont' worry, you will feel alright,' and he said: 'I need air, sea air,' and I said then: 'Don't think of the sea. Tell me,' and the man began his narrative as follows:

" 'I left the boat at 7, went to the movies and afterwards to the Porto Rico Drug to have a refreshment. I met there two fellows from the boat. Together we decided to go to Puerta de Tierra to drink a glass of beer. After drinking the beer in Puerta de Tierra we made up our mind to return to the boat as our leave was until 10.30. When going down by the station, facing a lane, I was walking ahead and my two companions behind. There I noticed a man, in company with another darker than himself, who attacked me. I could not recognize him. I only know that on raising my hand I felt the shot and fell, and the man ran away through a lane in front, and as to the other, I did not know what became of him. I then called Hans, one of my companions, and said to him: "Hans, save me," and Hans started running with the other. The policeman came up and brought me to the hospital.' "

Finally, the witness recognized the bullet shown her as being similar to the one handed to her by Dr. Comas, which she in turn handed over to the detectives.

Policeman Evaristo Labastide, sixth witness to testify, was the person who took the wounded man to the hospital. He testified that he was on duty in front of dock No. 5 and heard a shot. We went towards the place and saw two men running, two foreigners who told him that their companion had been wounded at the corner. He went on and found a man by the name of Paul C. Herdering lying on the ground. He called the ambulance and took him in it to the hospital. It was after eleven o'clock at night.

The second witness for the prosecution was Natividad Espada who directly charges the defendant with the commission of the crime. He is a colored man, about twenty years of age, a resident of Puerta de Tierra. He knew the defendant and on the night of February 3, 1932, he went for a walk with him from Puerta de Tierra towards San Juan, where they stayed until half past ten when they walked towards Puerta de Tierra and reached Plaza de los Leones. "Shortly," he says textually, a group of men emerged from the house of Carmen Capre and I heard him saying: "Let us go." We started along the same road leading to the railway station; from the railway station we went down to the Colectiva, and, there, he sat down by the door and I stood up. Within about twenty minutes the three men appeared, one ahead and two behind. When the man ahead turned the corner, he got up, thrust his hands into the right side, drew a pistol and said to him some words in English which I did not overhear. The man remained with his hands up. Then, showing courage, he meant to bring them down and when doing so he fired." "Dist. Attorney.—Who fired? Witness.—The Cuban. Dist. Att.—At whom? Witness.—At the man."

According to the record the following incident then took place:

"While Natividad Espada, the witness for the prosecution, was quietly testifying, defendant Antonio Mejías Ventura got up in a rage from his seat saying 'that is a lie, you are a scoundrel, a shameless man, a son of bitch; I can not let you lie so shamelessly to my face,' and grabbing from the table of the district attorney a volume of the Puerto Rico reports, threw it violently at the witness and succeeded in striking him with his right hand, and when he tried to move and attack him, he was grabbed by Daniel Sosa, the marshal of the court, with whom he wrestled fiercely until subdued by this officer with the help of detectives Santiago, Alvarado, Henna and chief Monteserín.

"First of all, the court is of the opinion that there is sufficient ground to institute proceedings for contempt of court and this will

be considered later on, but in the meantime and owing to the disorderly conduct of the defendant in open court and since the trial must be proceeded with and in order to maintain order within the court, the defendant is ordered to be handcuffed.

"Defendant.—While regretting the incident, I move the court to reconsider its order that the defendant be handcuffed.

"Judge.—Motion denied."

The witness further testified that "El Cubano" after firing started to run. He recognized the suit and hat as those the defendant was wearing that night. Also the pistol which he had previously seen in defendant's room.

The attorney for the defendant submitted the witness to a cross-examination that fills forty pages of the record. The witness not only maintained his previous statements but in some particulars he reasserted and explained them. For instance, he said that when they were in the Plaza de los Leones "while standing there he (the defendant) told me that Americans used to visit the house of Carmen Capre there in front and that they usually were drunk when coming out, and that the way they could be caught was while drunk."

The testimony of the next witness, Eugenio Ayala, is without importance. That of María Torres Ríos, a poor harlot who was next called to testify, is really important. She stated that she resided at Puerta de Tierra in a room of the same house where defendant was living; that she had come to San Juan for fresh air on the night of February 3, 1932, and returned about eleven. "I went by the railroad station and in a dark place I saw a man running. I became frightened and ran also behind and when coming into the light I recognized the Cubano . . ."

Antolino de Jesús is the husband of Carmen Capre who apparently is the owner of a bawdyhouse near the Plaza de los Leones. He said that he was watching the house the night of the crime because he was fearing that it might be reported. Carmen Capre called his attention to two men who stood at the square insistently looking towards the house

and he went to find out who they were and as they were not the people he feared he did not worry. He identified the defendant and the witness Espada as the two men he saw. It was about 10 p. m.

Detective Carlos Alvarado was detailed to investigate the crime. Clara Angleró, who was defendant's concubine in a former trip made by him to Puerto Rico and to whom he went in his last trip but who was unable to keep him because Clara had another man, was the first person to tell them about defendant's pistol, giving them light when she referred to other "holdups" carried out by him. Their suspicions were aroused. The defendant was a foreigner without work, who kept women in well furnished rooms. They resolved to search the rooms and secured a search warrant. They made the search but could only seize his clothes. It was later on that they seized the pistol that was handed to them by Rosa.

This latter witness is the landlady in whose house the witness Espada was lodging near the defendant. She testified that Elisa Malavé who was living with the defendant came to her and said:

"They have taken away the valise, the shoes and the clothes from the rack, belonging to El Cubano. . . . ." I said nothing. Then suddenly she comes hurriedly and places in my hands a package for me to keep for her.

"Dist. Attorney.—What kind of package was it?

"Witness.—A package wrapped up in one of her dresses and a newspaper.

"        .        .        .        .        .        .        .        .        .        .

"Witness.—When I got home I looked at it and saw it was a pistol. I then decided to keep it."

Elisa Malavé, who was indeed living with defendant whose business was "To gamble at times" and who she helped when he was out of funds with the money received from friends who visited her, testified as follows:

"After the detectives left I went to the house of Rosa del Valle and told her that they had arrested El Cubano but that I did not

know who had arrested him, whether the immigration authorities had done it. I was crying because I suffer from nerves and got frightened when I saw all the detectives in my house. She then said to me: 'Let us go there and see what happened,' and she and Natividad came home with me. Then, on the way, she said: 'And the pistol?' and I said to her: 'Well, it is kept there,' and she said to me: Well, let me keep it for him.'

"Dist. Attorney.—Where was that pistol?

"Witness.—Kept away underneath the house.

"Dist. Attorney.—Underneath whose house?

"Witness.—My house.

"    .    .    .    .    .    .    .    .    .    .    .

"Dist. Attorney.—Who told you that that pistol was there underneath the house?

"Witness.—Nobody told me. Merely, on the day before he told me 'Don't throw water that way.'' Then after he left I, nosing, around, found the pistol.

"Dist. Attorney.—When he got up on that morning, did he not tell you that that pistol was underneath the house?

"Witness.—He did not tell me in the morning; he said to me the day before he was arrested: 'Don't throw water that way,' and I, nosing around, found the pistol.

"    .    .    .    .    .    .    .    .    .    .

"Dist. Attorney.—At the time the detectives were searching, did you tell them that that pistol was there?

"Witness.—I said nothing to the detectives.

"Dist. Attorney.—And did you know that the pistol was there?

"Witness.—I did, but I did not tell it to the detectives.

"Dist. Attorney.—Were you living with the defendant?

"Witness.—I was.

"Dist. Attorney.—Did you use to give him money?

"Witness.—Whenever I had any. When he had none I would help him, because when he had made money working, he would help me.''

Clara Angleró, the first mistress of the defendant, testified that the latter came to Puerto Rico in 1931 and went to her home and that: "he brought a badge in his valises and carried a pistol on the other side of his body,'' and that said pistol is similar to the one now shown to her. "I told him that he could not stay and he left.''

"On cross-examination by the attorney for the defendant she stated that in 1929 she was married to the defendant who beat her and left; that he came back again and 'he cowardly beat me on an

occasion when I was going to take a jitney, he beat me and I denounced him. The Boliviano, one of his witnesses, was there. There were a lot of people, but nobody was willing to appear as a witness'."

Again:

"Attorney.—Did you not threaten the Cubano then?

"Witness.—I did not threaten him, but I went and called policeman Dávila and told him what had taken place and mentioned to him the affair of the German.

"Attorney.—No, let us drop the German.

"Witness.—That was the cause of the trouble, the affair of the German."

When the cross-examination by the defendant was over, the district attorney again cross-examined the witness as follows:

"Dist. Attorney.—What was the cause of the trouble with the defendant?

"Witness.—Because he threatened me with the pistol the previous night, during a visit of the German. It happens that I went to get change for a bill for him . . . .

"Dist. Attorney.—Whose bill?

"Witness.—The German's."

The German to whom the witness refers was not the one who was mortally wounded on the night of February 3, 1932.

Finally, Monteserín, chief of detectives, recognized the bullet which Dr. Comas extracted from the dead body of the unfortunate Herdering which was handed over to him by his subordinate Alvarado who in turn received it from the manageress of the Municipal Hospital, and the bullet, the pistol, the clothes and the hat seized in the house where the defendant lived as belonging to him were introduced in evidence by the district attorney and admitted by the court over the objection of the defendant.

The evidence for the defendant consisted of the testimonies of Rafael Martínez Nadal, Manuel Iglesias and Antonio Quirós Méndez.

The first above named testified that Natividad Espada went to his law office to ask for advice. "He said to me: 'I need you advice as a man of experience'. What is the mat-

ter? 'That I have testified against that man, as the police arrested me as a suspect because I had been with him three or four days previously.' And he then said to me: 'And they have compelled me to testify to things which I have not seen or witnessed.' Whereupon I said to him: 'If you saw what you said in your testimony and if that is true, you must repeat your statements because a good citizen should not let a murderer escape and still less such a murderer who in order to steal holds up and kills a man in the darkness.' 'But that is not true,' he said to me. 'I have not witnessed that. What risk would I run if I rectify my testimony?' I said to him: 'Well, from one to ten years in the penitentiary for perjury. Is that statement which you say you made not true?' He said: 'No.' And I said to him: 'Then, that is another infamy. If you have seen nothing and yet you make such a statement against a man who might be sentenced for life to the penitentiary on your testimony, that is an infamy, and honest men do not start in life in that way.' Then the man kept silent for a moment, his eyes sort of became moist, and said: 'Then, I will go to the penitentiary.' "

Iglesias testified that he had seen the defendant on the night of February 3, 1932, about eleven, in Pelayo street, Puerta de Tierra. The witness is from South America, was working in a boat and stayed ashore because he had quarreled with the engineer.

Quirós Méndez is a practicing lawyer. He was at first appointed to represent the defendant and he was visited in his office by Elisa Malavé and María Torres who asked him to take a deposition from Natividad Espada, a witness for the prosecution. He told them that he could not do so himself, that they should return on the following day when he would have a notary at hand. They returned but no notary was available and an appointment was given them for the following day. They failed to appear and nothing further was done.

Such was, in short, the evidence which upon being submitted to the jury with the proper instructions from the

court served as a basis for a conviction which in turn supported the judgment appealed from.

In his brief the appellant assigns sixteen errors. The first two assignments refer to the identity of the dead man; those numbered 3, 5, 6 and 7 have to do with the testimony of the manageress of the hospital; assignment 4 is about the handcuffs incident; that under number 8 is in regard to the cross-examination of the witness Angleró; those marked 9, 10 and 11 relate to the admission in evidence of the bullet, the pistol and the wearing apparel; assignment 12 has reference to the admission of the testimony of witnesses who do not appear in the information; by assignments 13, 14 and 15 it is urged that the court erred in failing to instruct the jury that Espada was an accomplice, in failing to direct that the defendant be discharged, and in its instruction discrediting the alibi presented by the defendant. The last assignment is that the court erred in denying the motion for a new trial.

We will summarize briefly the evidence and the incidents of the trial not only to get acquainted with the case upon its merits but also to render a discussion of the errors more comprehensible and speedier.

The appellant fills twenty pages of his brief with a discussion of the question whether or not it was duly shown at the trial that the person who actually died from the wound was the one named in the information, Paul C. Herdering.

To our judgment the evidence is clear in this respect. The wounded man was picked up shortly after the assault by a policeman who first got in touch with his two companions. He was a young foreign sailor who was assaulted when returning with his mates to the boat after spending a few hours enjoying himself in town. The policeman himself testified that Paul C. Herdering was his name. The attorney for the defendant failed to object, he did not even ask the ground for his statement.

He was registered in the hospital as Paul C. Herdering and as such he was attended to by the surgeon of this institution. On the following day he was visited by the captain and the doctor of the boat who left instructions and the doctor recommended Herdering to the care of the manageress. He was properly attended, but without success. He was fatally wounded and death necessarily ensued. It was the dead body of Paul C. Herdering on which Dr. Comas performed a post morten examination and from which the murderous bullet was extracted.

In his argument on errors 3, 5, 6 and 7, the attorney for the defendant also made great efforts, citing a great many cases regarding dying declarations.

He claims that the declarations attributed in the instant case to the wounded man were not voluntary, the wounded man being unwilling to make them but that Mrs. Moreno forced him to talk; that they were not made under a clear sense of impending death or in a solemn moment; that the wounded man spoke in English and it was not shown that the person who took them knew the English language; that the wounded man showed hatred and thirst of revenge; that there was another proof of that which it was sought to prove, the testimony of Espada; that the statements regarding the aggressor also constituted a conclusion; that if they were taken down in writing, such writing should have been produced as constituting the best evidence, and that he was not given an opportunity to proceed with his cross-examination before the court ruled that the declaration was admissible.

We will not cite any jurisprudence. It is well known. We are concerned with an exception. The dying declaration can only be admitted through the person who heard it if it is really shown that the declarant realized his condition, speaking at such solemn moment as if he were ready to appear before God to give an account of his deeds.

We have not transcribed all the incidents which arose. We will transcribe that which we consider as most material.

The behavior of Mrs. Carreras failed to reveal such gravity and weight as would have rendered her a perfect witness. However, her apparent frivolity and her eagerness to know what had happened rather out of romantic curiosity than from a sense of duty are not sufficient to discredit her testimony. She showed herself as she was and the jury had an opportunity to come face to face with real life and not with something fabricated or feigned.

That Herdering realized his condition appears so clearly from the record that each of his words recorded therein reveals the certainty of an inevitable death. This was so even at such moments when he seemed to entertain faint hopes of recovery. As to his so called spirit of revenge, as to the hatred transpiring through his words, they were signs of his despair in the presence of the unusual occurrence of which he was the victim. This country of ours unfortunately had to appear to him as a gloomy, inhospitable and murderous land where he had been cowardly murdered.

In moments of spiritual uplift, in raptures of almost divine grandeur, man can not only forgive but even love his enemy and pray for those who injure and despise them. But this is not the rule, it is the exception in the highest degree.

The usual course is for things to happen as in the case of Herdering. If the spirit of hatred and revenge shown by his words should rouse at least the doubt that it could purposely injure a particular person, such spirit would render his declarations inadmissible. But no such thing appears here. His words are the expression of his grief, his indignation, his despair in view of the cruelty and injustice committed on him, thus taking his life, without justification, without defence; but in no way do they detract from the truth of everything he said.

Letting the facts speak for themselves, we think that no error was committed in allowing the evidence, especially

since the court after instructing the jury on the facts and the law on the matter finally said:

"If the jury are satisfied, after weighing the evidence, that declarant, Paul C. Herdering in the instant case, was in imminent danger of death and that he knew his condition, you may then consider the declaration of the dying man, that is, Paul C. Herdering, and it is the province of the jury to weigh, as any other piece of evidence, whether such declaration was actually made and whether or not the same is true."

We have considered all of the other errors assigned in connection with the dying declaration and to our judgment they are without merit.

Assignments 8 to 12 are also without merit and require no written argument to prove it. We will dwell a little longer on the question as to whether or not the witness Espada is an accomplice, on the handcuffs incident and on the evidence for the defendant.

From the testimony so far analyzed we could only conclude that on the night of February 3, 1932, a murder was committed on the person of Paul C. Herdering and that the information charged Antonio Mejías Ventura with its commission, but not that the latter committed it. It is by the testimony of Espada that the defendant is directly connected with the crime charged against him.

We know that testimony. It is conclusive. If believed, it would by itself be sufficient to sustain the verdict and the judgment. The jury believed it notwithstanding the doubts cast by the testimony of Martínez Nadal. It seems advisable to state now that Espada denied having made such statements.

If it is admitted that he spoke fully the truth, Espada is not an accomplice. We very much question, however, that Espada had no previous knowledge as to something wicked being plotted, although we think that he never imagined the extent of the actual consequences of the plot. But even conceding that from the cross-examination and the natural con-

struction of the facts themselves Espada could be considered as an accomplice, his testimony would always stand, as it was amply corroborated by the rest of the evidence.

Irrespective of the dying declaration of the murdered man, Apolonio de Jesús saw the defendant with Espada in a watchful attitude in the Plaza de los Leones and María Torres saw him running along the track shortly after the crime, near the place where it was committed, and his pistol was found by his mistress in the spot where he had hidden it underneath the house.

From all the above testimonies something transpires that speaks for itself very forcibly, and that must have been more eloquent even for the jury, who could read into the souls of the witnesses through their faces and gestures.

From the above circumstances we can not see that the court erred in giving the following instructions:

"The evidence has tended to show that Natividad Espada accompanied defendant Antonio Mejías Ventura and this fact might render him an accomplice according to the way his intervention might be considered by the jury.

"An accomplice, under our Penal Code, is he who aids or abets the commission of a crime.

"Under the common law, the declarations of accomplices are sufficient to sustain a conviction even though they may not be corroborated, although their credibility should be considered by the jury bearing in mind that they are not of the most satisfactory nature. This is why some Legislatures, like ours, have preferred to prescribe that a person cannot be convicted upon the testimony of an accomplice unless it is corroborated. The accepted general rule to ascertain whether or not a witness is an accomplice is to consider whether or not he could be prosecuted for the same crime under investigation, because if he can not be so prosecuted he can not then be considered an accomplice, and the participation of the accomplice must be in the same crime, it not being sufficient that he may have participated in other similar crimes.

"An accomplice to a crime, as above stated, is he who aids or abets its commission. The testimony of an accomplice becomes corroborated where, after striking out the evidence from the accomplice, there is evidence tending to connect the defendant with the

crime. The following is suggested as an adequate test: suppress from the case the testimony of the accomplice and then examine the evidence of the witness or witnesses in the case in order to ascertain whether there is any incriminating evidence, evidence tending to connect the defendant with the crime charged against him. If there is such evidence, the accomplice is corroborated. If there is no incriminating evidence, there is no corroboration even though the accomplice could be corroborated as to any other number of facts testified to by him.

"The mere silence of a man who neither aids nor abets and who does not try to help the defendant does not render him an accomplice. Nor the fact that he knew that a crime was about to be committed and failed to report thereon."

The handcuffing incident can not be ground for a reversal. The court acted properly. Moreover, no exception appears to have been finally taken. It does not appear that the defendant was kept handcuffed during the remaining sittings. If the defendant was prejudiced thereby he has only himself to blame. The prejudice would arise not from the handcuffing but from the behavior of the defendant.

The evidence for the defendant was weighed by the jury together with that for the prosecution. In the jury's conscience the preponderance was on the side of the prosecution and the defendant was convicted. There was no error.

We have examined the instructions of the court regarding the alibi defence and we do not think that they tended to discredit that presented by the defendant. The statement by the court that "alibi is a defence that is easiest to fabricate and hardest to disprove and should be considered with care and caution" is not error, especially if the court cautioned the jury immediately that it did not mean that the alibi presented in the instant case was fabricated and in an impartial and broad way took up the analysis thereof.

Therefore, as all the errors assigned are without merit, as the guilt of the defendant clearly appears from the record, and as the information, the verdict and the judgment conform to the law, both appeals must be denied and the judgment appealed from must be affirmed.